## IN THE CIRCUIT COURT FOR BALTIMORE CITY

| | |
|---|---|
| HENRY CLAYPOOL,<br>1819 North Hollister Street<br>Arlington, Virginia 22205, | *<br>*<br>* |
| ANDREW D. LEVY,<br>7029 Mink Hollow Road<br>Highland, Maryland 20777, | *<br>*<br>* |
| and | * |
| KELLY BUCKLAND,<br>4432 Miniature Lane<br>Fairfax, Virginia 22033, | *  Case No. _____<br>*  Jury Trial Requested<br>* |
| Plaintiffs, | * |
| v. | * |
| BALTIMORE ORIOLES LIMITED<br>PARTNERSHIP,<br>Serve On: Peter G. Angelos, Esquire<br>100 North Charles Street, 22nd Floor<br>Baltimore, Maryland 21201, | *<br>*<br>*<br>* |
| BALTIMORE ORIOLES, INC.,<br>Serve On: Peter G. Angelos, Esquire<br>100 North Charles Street<br>Baltimore, Maryland 21201, | *<br>*<br>* |
| BALTIMORE ORIOLES PROPERTIES, LLC,<br>Serve On: Jeffery J. Utermohle, Esquire<br>100 North Charles Street, 22nd Floor<br>Baltimore, Maryland 21201, | *<br>*<br>*<br>* |
| and | *  |
| THE MARYLAND STADIUM AUTHORITY,<br>Serve On: Hon. Brian E. Frosh<br>Maryland Attorney General<br>200 St. Paul Place<br>Baltimore, Maryland 21202, | *<br>*<br>*<br>* |
| and | * |
| | * |

Serve On: Michael J. Frenz
          Maryland Stadium Authority    *
          333 West Camden Street, Suite 500
          Baltimore, Maryland 21201,    *

Defendants.    *

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

## PRELIMINARY STATEMENT

Henry Claypool, Andrew D. Levy, and Kelly Buckland bring this Complaint for injunctive relief and damages against Baltimore Orioles Limited Partnership, Baltimore Orioles, Inc., Baltimore Orioles Properties, LLC, (collectively "the Orioles Defendants"), and the Maryland Stadium Authority ("MSA") (all of the Defendants are referred to collectively as "Defendants") and allege:

1.    Oriole Park at Camden Yards ("Camden Yards"), located in downtown Baltimore, is the home stadium of the Baltimore Orioles – a professional baseball organization operated by the Orioles Defendants. Among the 30 venues in Major League Baseball, Camden Yards is widely considered to be one of the best places in the country to watch a baseball game. That is, so long as one is not a wheelchair user like Plaintiffs.

2.    Since Camden Yards opened in 1992, the wheelchair accessible seating there has never met the strictures of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 – 12213 ("ADA"), and each of the three Plaintiffs have been harmed by Defendants' continuing violations of the ADA.

3.    On separate occasions between July 2017 and May 2018, each Plaintiff became trapped in a Limited Use Limited Application ("LULA") lift that wheelchair users must use to reach an accessible seating area in Section 242. All of the incidents occurred <u>after</u> Defendants

2

were on notice that the LULA lift had previously malfunctioned and that the lift posed an unreasonable risk of entrapping ballpark patrons who need to use it.

4. Plaintiffs have also suffered, and are likely to suffer in the future, the obstructed line of sight that plagues the wheelchair accessible seating areas adjacent to the walkway that ballpark patrons use to access Sections 1 through 98 on the lower level of the stadium. Wheelchair users seated in those areas are blocked from seeing the field of play when fans in the row of seats immediately in front of them stand up, which they do multiple times in the course of a game, most often (naturally) during the most exciting plays.

## PARTIES

5. Plaintiff Henry Claypool is an adult resident of Virginia and a wheelchair user.

6. Plaintiff Andrew D. Levy is an adult resident of Maryland and a wheelchair user.

7. Plaintiff Kelly Buckland is an adult resident of Virginia and a wheelchair user.

8. Defendant Baltimore Orioles Limited Partnership is a limited partnership organized under the laws of the State of Maryland. It maintains its principal place of business at 333 West Camden Street, Baltimore, Maryland 21201, and operates, at least in part, the Baltimore Orioles professional baseball team and Camden Yards.

9. Defendant Baltimore Orioles, Inc., is a corporation organized under the laws of the State of Maryland. It maintains its principal place of business at 333 West Camden Street, Baltimore, Maryland 21201, and operates, at least in part, the Baltimore Orioles professional baseball team and Camden Yards.

10. Defendant Baltimore Orioles Properties, LLC, is a limited liability company organized under the laws of the State of Maryland. It maintains its principal place of business at

333 West Camden Street, Baltimore, Maryland 21201, and operates, at least in part, the Baltimore Orioles professional baseball team and Camden Yards.

11. Defendant the Maryland Stadium Authority was created by the Maryland General Assembly in 1986 as an independent unit of the Executive Branch of State Government. By statute it has "the power to develop, establish, acquire, own, lease, improve, operate as landlord, regulate, maintain, sell, transfer, or otherwise dispose of any portion of Camden Yards." Md. Code Ann., Econ. Dev. § 10-616(b).

## STATEMENT OF FACTS

12. Camden Yards opened to great fanfare on April 6, 1992, as a "brand new, but still old-fashioned," baseball only facility that, today, seats 45,971. Oriole Park at Camden Yards History, available at https://www.mlb.com/orioles/ballpark/information/history (last accessed September 24, 2018). Concerns regarding wheelchair accessible seating were raised during the process of designing and building Camden Yards but, unfortunately, have never been adequately addressed.

13. Mr. Levy has been a season ticket holder of the Baltimore Orioles, either individually, or through his law firm, since 1981. Since Camden Yards opened, Mr. Levy's season tickets have been in the "WC" (*i.e.*, wheelchair accessible) row of Section 242 located on the stadium's club level.

14. As early as 1989 (well before Camden Yards opened to the public), Mr. Levy and representatives from the MSA discussed the differential between the height of the wheelchair accessible seating areas around the lower level of Camden Yards and the rows of seats immediately in front of them. That insufficient differential is what causes wheelchair users in the

accessible seating areas to suffer an obstructed line of sight when individuals seated in the rows in front of them stand up. *See supra* ¶ 4.

15.     Mr. Levy renewed his concerns regarding that issue, and other accessibility issues, including access to the WC row in Section 242, with the MSA multiple times. After one series of conversations with MSA representatives in 2010, Mr. Levy was informed that steps would be taken to ensure that wheelchair users have appropriate access to the WC row in Section 242.

16.     Sometime between the end of the baseball season in 2010, and the start of the new season in 2011, Defendants installed a LULA lift in Section 242. Wheelchair users use the lift to traverse an approximately five-foot drop from the concourse level to the WC row; non-wheelchair users access the same area by a short flight of stairs adjacent to the lift.

17.     The lift has malfunctioned on a regular basis since it was installed.

18.     For example, on July 1, 2017, the Orioles were playing the Tampa Bay Rays and Mr. Buckland was attending the game with his wife, son, and another attorney from Mr. Levy's law firm. When Mr. Buckland arrived at Section 242, he was required to wait several minutes for one of the stadium ushers to unlock the LULA lift since Defendants do not allow ballpark patrons to operate the lift by themselves. After Mr. Buckland entered the lift carriage, the doors closed behind him as expected, but the lift did not move down to the WC row as it should have. The stadium ushers tried several times to get the lift moving and, when they could not, contacted the MSA engineer who was on site during the game for assistance. All the while, Mr. Buckland was trapped in the lift carriage. He finally made it to the WC row after the engineers got the lift working. Although he might have otherwise returned to the concourse level to purchase concessions or experience the ballpark atmosphere one or more times during the game, he did

not for fear of becoming trapped in the lift carriage again. At the end of the game, MSA engineers were again needed to facilitate Mr. Buckland's egress from the seating area.

19. Mr. Buckland was embarrassed and frustrated by the incident in multiple respects. Not only was Mr. Buckland upset about being stuck in the lift carriage during a special outing with his family, but he was upset that he needed to wait for an usher to assist him with the lift at all – an access barrier that individuals who do not use wheelchairs never face.

20. Mr. Levy himself has also had trouble with the LULA lift multiple times, the most recent of which occurred on August 20, 2017.

21. On that date, the Orioles were playing the Los Angeles Angels and Mr. Levy was attending the game with his family to celebrate his grandson's birthday. After waiting for an usher to open the lift, during which time he was separated from his family, he entered the lift and started to descend to the seating level, at which point the lift abruptly stopped, approximately half-way down. As a result, Mr. Levy was stuck in the lift carriage between the concourse level and the seating level. Although the usher, and then Mr. Levy, attempted to operate the controls to get the lift moving again, it would not budge. It took several minutes and required the assistance of MSA engineers to free him. MSA engineers were also needed to facilitate Mr. Levy's use of the lift at the end of the game.

22. The incident was embarrassing for Mr. Levy. He felt helpless while he was stuck in the lift carriage and he was concerned for his safety. In addition, he was upset that his inability to use the lift independently and the lift's malfunction impacted his experience at the ballpark with his family on such a special occasion.

23. On August 24, 2017, Mr. Levy had a letter hand delivered to counsel for the MSA in which he described the August 20 incident and advised the MSA that it was violating the

ADA by failing to ensure that wheelchair users can access the seating area in Section 242 as safely and reliably as individuals who do not use wheelchairs.

24. On May 13, 2018, Mr. Claypool was attending the Baltimore Orioles game against the Tampa Bay Rays with his wife, who is one of Mr. Levy's law partners and thus a part-owner of the same season tickets as Mr. Levy. While Mr. Claypool was able to access the WC row of Section 242 without incident, when he tried to leave the seating area, the LULA lift stopped before it reached the concourse level. Like Mr. Buckland and Mr. Levy, Mr. Claypool was trapped in the lift carriage for several minutes until employees of the Orioles Defendants and MSA engineers were able to pry open the lift's doors enough for Mr. Claypool to force his wheelchair up and over the ledge between the lift platform and the concourse level.

25. The incident was embarrassing for Mr. Claypool and left him feeling helpless and concerned for his safety. While trapped, it was unclear to Mr. Claypool that he would be able to exit the carriage without being injured. Like Mr. Buckland and Mr. Levy, Mr. Claypool was upset that his inability to use the lift independently and the lift's malfunction impacted his experience at the ballpark with his wife.

26. After he was freed from the lift carriage Mr. Claypool and his wife were reseated in Section 230, which also has a "WC" row that wheelchair users are expected to access using a LULA lift. On information and belief, the lift in that section was installed at the same time as the one in Section 242. Although Mr. Claypool was able to operate the lift in Section 230 without incident on that day, on information and belief, it too has malfunctioned on multiple occasions and prevented wheelchair users from safely and reliably accessing their seats.

27. On June 11, 2018, pursuant to the Maryland Tort Claims Act, Md. Code Ann., State Gov't §§ 12-101 – 110, Mr. Levy and Mr. Claypool each provided notice to the State

Treasurer of the facts relating to their respective entrapments in the LULA lift, and the damages that they suffered as a result. As of the date of this filing, the State Treasurer has not responded to Mr. Levy or Mr. Claypool's submissions.

## CAUSES OF ACTION

### COUNT I
### (ADA – Title II)
### By All Plaintiffs Against the Maryland Stadium Authority

28. Plaintiffs incorporate each of the foregoing allegations as if fully stated herein.

29. The ADA prohibits a public entity, like the MSA, from denying "the benefits of [its] services, programs, or activities" to qualified individuals with disabilities, like Plaintiffs, or discriminating against them, based on their disabilities. 42 U.S.C. § 12132.

30. The MSA is responsible for "improv[ing], operat[ing], and maintain[ing]," Camden Yards. Md. Code Ann., Econ. Dev. § 10-613(a)(9).

31. Plaintiffs are likely to return to Camden Yards because of their status as a season ticket holder (in the case of Mr. Levy) or their relationship to a season ticket holder, as well as the fact that Camden Yards is a one-of-a-kind venue for watching live professional baseball, which all three Plaintiffs enjoy.

32. By failing to ensure that wheelchair users like Plaintiffs have safe and reliable access to all areas of Camden Yards equal to that of individuals who do not use wheelchairs, the MSA denied (and continues to deny) Plaintiffs their right to enjoy the benefits of its services, programs, or activities, and it discriminated (and continues to discriminate) against Plaintiffs based on their disabilities.

33. By failing to ensure that wheelchair users like Plaintiffs are able to view the field of play from the accessible seating areas around the lower level of Camden Yards without

obstruction, to the same degree as individuals who do not use wheelchairs, the MSA denied (and continues to deny) Plaintiffs their right to enjoy benefits of its services, programs, or activities, and it discriminated (and continues to discriminate) against Plaintiffs based on their disabilities.

34. Plaintiffs' right to enjoy access to Camden Yards and to watch live professional baseball there – a right available to anyone holding a ticket for admission to the ballpark – will be irreparably injured until this Court orders the MSA to comply with the ADA.

35. The benefits that would inure to Plaintiffs from an injunction are equal to or outweigh any potential harm that the MSA might encounter if an injunction were granted.

36. The public interest is best served by granting the requested injunction. Indeed, there is an untold number of patrons of the ballpark who rely on mobility aids who would benefit from the requested injunctive relief.

37. As a direct, proximate, and consequential result of the MSA's failure to comply with the requirements of the ADA, Plaintiffs have each suffered damages that exceed $75,000.

## COUNT II
### (ADA – Title III)
### By All Plaintiffs Against the Orioles Defendants

38. Plaintiffs incorporate each of the foregoing allegations as if fully stated herein.

39. The ADA prohibits those who own, lease, or operate places of public accommodation from discriminating against individuals on the basis of disability. 42 U.S.C. § 12182(a).

40. Camden Yards is a place of public accommodation, 42 U.S.C. § 12181(7)(C), that is owned, leased, or operated by the Orioles Defendants.

41. Plaintiffs are likely to return to Camden Yards because of their status as a season ticket holder (in the case of Mr. Levy) or their relationship to a season ticket holder, as well as

the fact that Camden Yards is a one-of-a-kind venue for watching live professional baseball, which all Plaintiffs enjoy.

42. By failing to ensure that wheelchair users like Plaintiffs have safe and reliable access to all areas of Camden Yards equal to that of individuals who do not use wheelchairs, the Orioles Defendants denied (and continue to deny) Plaintiffs "the full and equal enjoyment of [its] goods, services, facilities, privileges, advantages, or accommodations," 42 U.S.C. § 12182(a), and they discriminated (and continue to discriminate) against Plaintiffs based on their disabilities.

43. By failing to ensure that wheelchair users like Plaintiffs are able to view the field of play from the accessible seating areas around the lower level of Camden Yards without obstruction, to the same degree as individuals who do not use wheelchairs, the Orioles Defendants denied (and continue to deny) Plaintiffs "the full and equal enjoyment of [its] goods, services, facilities, privileges, advantages, or accommodations," 42 U.S.C. § 12182(a), and they discriminated (and continue to discriminate) against Plaintiffs based on their disabilities.

44. Plaintiffs' right to enjoy access to Camden Yards and to watch live professional baseball there – a right available to anyone holding a ticket for admission to the ballpark – will be irreparably injured until this Court orders the Orioles Defendants to comply with the ADA.

45. The benefits that would inure to Plaintiffs from an injunction are equal to or outweigh any potential harm that the Orioles Defendants might encounter if an injunction were granted.

46. The public interest is best served by granting the requested injunction. Indeed, there is an untold number of patrons of the ballpark who rely on mobility aids who would benefit from the requested injunctive relief.

## COUNT III
### (Negligence)
### By Mr. Claypool and Mr. Levy Against the Orioles Defendants

47. Plaintiffs incorporate each of the foregoing allegations as if fully stated herein.

48. The Orioles Defendants have a duty to ensure that patrons of Camden Yards who use wheelchairs, like Mr. Claypool and Mr. Levy, can do so safely, including by, among other things, ensuring that those patrons do not become trapped in the LULA lift that they must use to access the WC row of Section 242.

49. Before August 20, 2017, the Orioles Defendants were on notice of defects in the way the LULA lift in Section 242 was installed and/or maintained that might cause ballpark patrons to become trapped in the lift.

50. Because the Orioles Defendants failed to properly install, maintain, or otherwise address defects in the LULA lift in Section 242, about which they knew or should have known, Mr. Claypool and Mr. Levy became trapped in the lift on August 20, 2017, and May 13, 2018, respectively, in breach of the duty that they are owed by the Orioles Defendants.

51. As a direct, proximate, and consequential result of the Orioles Defendants' breach, Mr. Claypool and Mr. Levy each suffered damages that exceed $75,000.

## COUNT IV
### (False Imprisonment)
### By Mr. Claypool and Mr. Levy Against the Orioles Defendants

52. Plaintiffs incorporate each of the foregoing allegations as if fully stated herein.

53. By failing to properly install, maintain, or otherwise address defects in the LULA lift in Section 242, about which the Orioles Defendants knew or should have known, the Orioles Defendants deprived Mr. Levy of his liberty without his consent on August 20, 2017, when he

became trapped in the LULA lift carriage while attending the Baltimore Orioles game at Camden Yards.

54. By failing to properly install, maintain, or otherwise address defects in the LULA lift in Section 242, about which the Orioles Defendants knew or should have known, the Orioles Defendants deprived Mr. Claypool of his liberty without his consent on May 13, 2018, when he became trapped in the LULA lift carriage while attending the Baltimore Orioles game at Camden Yards.

55. As a direct, proximate, and consequential result of the Orioles Defendants' conduct, Mr. Claypool and Mr. Levy each suffered damages that exceed $75,000.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Issue an Order requiring Defendants to comply with the ADA by providing wheelchair users like Plaintiffs, and other individuals who use mobility aids, equal access to the Defendants' services, facilities, privileges, advantages, or accommodations, by, *inter alia*, ensuring that such individuals have safe and reliable access to the WC seating area in Section 242, and an unobstructed line of sight from the wheelchair accessible seats that ring the lower level of Camden Yards (Sections 1 – 98);

B. Award each Plaintiff damages in an amount greater than $75,000 to be proved at trial;

C. Award Plaintiffs the costs and expenses they have incurred to bring this action pursuant to 42 U.S.C. § 12205; and,

D. Grant any such other and further relief as this Court may deem just and proper.

Respectfully submitted,

*/s/ Sharon Krevor-Weisbaum*

Sharon Krevor-Weisbaum
Kevin D. Docherty
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T: 410.962.1030
F: 410.385.0869
skw@browngold.com
kdocherty@browngold.com

Dated: September 28, 2018              *Attorneys for Plaintiffs*

## PLAINTIFFS' DEMAND FOR A JURY TRIAL

Plaintiffs Henry Claypool, Andrew D. Levy, and Kelly Buckland, through counsel, and pursuant to Rule 2-325, hereby demand a jury trial in this action.

Respectfully submitted,

*/s/ Sharon Krevor-Weisbaum*

Sharon Krevor-Weisbaum
Kevin D. Docherty
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T: 410.962.1030
F: 410.385.0869
skw@browngold.com
kdocherty@browngold.com

Dated: September 28, 2018              *Attorneys for Plaintiffs*